All right, the Honorable Judges for the Third Circuit Court of Appeals. We're now in session. Please be seated. Mr. Lussberg, as you know, judges of this court never put the hook out at any point, and we're not about to start now, but we'll probably adhere to a little bit more, a little more to the clock on rebuttal. Oh, I intend to be very brief. And let me just say, I appreciate, we appreciate the amount of time that the Court's given. I think I can speak for both sides to this matter, and Your Honor's obvious attention. I'm just going to address the first three issues, and I'm going to do so very briefly and just make a few points with regards to each. First, with respect to the question of substitution of counsel, Mr. Zausmer repeatedly said that the question was really a chronic question, but it is not a chronic question. Chronic is an ineffective assistance of counsel claim. As I said in the very first opening colloquy with the Court this morning, this is not an ineffective assistance of counsel claim. Does it matter that it was a direct appeal, like this is a direct appeal? It does not. It does not. I mean, because in order for an ineffective assistance of counsel claim to have been adjudicated on direct appeal, there would have had to be a sufficient record. And I think we have to be honest with the Court and say, when you ask the questions of all of what, tell us everything that could have gone, that went wrong as a result of the delay that, in the appointment of Mr. Propera, we can't. That's not a record that's available to us. We've tried to give a few examples. The government has attempted to deconstruct those. You were cross-examining, as you said, Judge Jordan, with respect to those. Those are reasonable things to do. But at the end of the day, the standard that the Court has to decide is, if you agree with us that the delay in the appointment of counsel mattered, and respectfully, we think you should find that it did, then the question becomes, has the government proven beyond a reasonable doubt that it did not affect the outcome of this death penalty case? And you will remember that in our discussion with regard to that point, that was where we discussed the many really horrific cases where death verdicts were not returned. And there are many studies that stand firmly for the proposition that the big difference between those cases in which death verdicts are returned and those that are not is the performance of counsel. Just as a matter of pure common sense, wherever you want to draw the line, it simply can't be the rule that courts can delay in the appointment of learned counsel, a position that is provided for by statute, in what is the midst of jury selection. Four days before voir dire, and only a month or two at that point before trial. So it was really two, almost three months. But during which voir dire is taking place. So in a lot of ways, this argument is an appeal to just pure common sense. It must have mattered, but if it didn't, the government has to have satisfied you beyond a reasonable doubt that it didn't. And respectfully, as great of an advocate as my friend Mr. Zosmer is, he didn't do that today. He did say a few things in the context of the substitution claim that I found at least upsetting. One was, he was asked, you know, are you troubled by the fact that the court waited, confronted with this correspondence in June and didn't respond to it until a hearing, essentially, at the beginning of November. And he said he wasn't troubled. You know, I think our government would... Would you address in this rebuttal specifically his assertion that it's got nothing to do with Mr. Savage waiving anything, because it's not about Mr. Savage, it's about he's not entitled to counsel of his choice. So they didn't have to ask Mr. Savage a thing. Right. That was the last point I was going to make. And that point is absolutely belied by the case law, and in particular Martel and Welty. When defendants raise the kind of claims, requests, that Mr. Savage raised, the law could not be clearer that the court is supposed to address them directly and obtain any kind of waiver from them on their behalf. On the record, if this were a matter of purely a continuance, the government might have a better argument. But that's not what this was a matter of. On November 1st, the court had Mr. Savage in front of him, in front of it, and faced with a correspondence from Mr. Savage back in June, where Mr. Savage said I don't want the trial delayed, it absolutely should have asked him. Now we're in November. Is that still your position? Do you understand that you're getting new counsel who may or may not be prepared, or could have drilled down on how prepared Mr. Perpora was, how much information he had been given by Mr. Sullivan? There were numerous questions that could and should have been answered by Mr. Savage, because this was a matter of counsel. One of the most fundamental rights under our Constitution, and clearly the most critical factor of all in death cases, which is why we have the laws that we have today. By that moment, Mr. Perpora had already spoken to Mr. Savage, hadn't he? He had spoken to Mr. Savage. The record was apparently he met him in June. There was no question that he had spoken to him that morning. But he did not represent, in that colloquy, that he had spoken to him at all about the timing, or that Mr. Savage was in any way waiting. Correct. The colloquy, which I read in full earlier, just had to do with are you okay with Mr. Perpora coming in. It's just an inadequate colloquy. And whatever this Court does, it should make clear that particularly in a capital case, that's an inadequate colloquy. But it can't be the law that courts can look the other way when new counsel, lead counsel, responsible largely, by the way, for the penalty phase. I don't know if they had any discussions, you know, from the time they first met up until the time this matter was put on the record. But Mr. Savage did say, I am satisfied with Mr. Perpora. Did he or not? Being appointed. That's what he said. Satisfied with his appointment. He had asked, and Mr., it's a reasonable question because Mr. Zausman made a big point about the question that what Mr. Savage had originally requested was particular counsel. He wasn't given those particular attorneys that he had originally asked for in his letter. Instead, he was given Mr. Perpora. And he agreed to it, to it being Mr. Perpora, as one would given his credentials. But as I said at the very outset of this argument, one's credentials are one thing. The ability to bring those credentials to bear in doing an effective job in a death penalty case, which is such a different enterprise than other types of litigation for those in this room who have tried them, they know that. To say it's challenging to do it in that period of time for Mr. Zausman to laud Mr. Perpora's performance and say he did a good job, that's great. But really the government has to prove to you, to your satisfaction, to where you're comfortable, that this result would not have been different had he been given the amount of time that everybody else had been given, which was years. That's a key point, right? Who's got the burden here? Is it Cronick or is it Chapman? That is a, I would agree that that's a key point, Your Honor. Because if it is Cronick, where's your showing of prejudice? Right. We haven't even endeavored. Because if this case, if the court affirms this, there will, I would imagine, be a 2255 in which somebody will attempt to prove. I think it takes a lot of imagination. So yes. Moving to transferred intent, and I'm only going to address, as I said, the first three and I'll do so as briefly as possible. Your Honor, Judge Smith, you asked whether the parties are cherry-picking and, you know, it doesn't occur for the court have to. Cases, yeah. On the cases. We're not really cherry-picking cases. Let me be clear, so the way we view what we're doing is. What we feel that we're doing is looking at treatises, looking at legal dictionaries, looking at legal sources, and it may be that some of them date from the 15th century, as Mr. Zausmer said. But that I would respectfully submit makes them more venerable, not less. And describing what the doctrine of transferred intent was described as uniformly. And by the way, the cases from the Supreme Court, from this court, since, you know, since 84, subscribe to that definition. Then what I attempted to do was to show how that definition is not the same as what we've been calling, and I grant that if you Google it or however people do legal research these days, that you won't find something called multiplied intent. But what we're saying is that we're using that phrase to describe what the government proposed and what the jury was instructed here. And that description is a very different thing as a matter of legal jurisprudence, and that fundamentally is our argument. What they say is that there are cases. We have attempted to deconstruct their cases, and our view, just so it's clear, is that there is one case pre-1984 that supports their position, and that is that sample case. And that sample case is not sufficient as a matter of law to describe the consensus that has to exist in order for there to be a generic definition upon which this court is required to rely in deciding what the definition of murder was under Vicar in 1984. I'm happy to take it on. I mean, to my view, the methodology of Waddell is precisely what we describe here, and in some ways exactly what was missing in this case. Which is, for the second victim in Waddell, the court said, there may be criminal liability, but what that liability is, is something for you to determine. And here, juries were not given, for example, which they were in Waddell, I believe, the alternative of the lesser included. But we've said all along, and again, I just want, because this is important, Judge Jordan, in particular, to the policy argument that you were describing. I know I said it before, and I'll repeat quickly. We are not saying that there's any free lunch here. One does not get free victims. One is entitled, with regard to each victim of each offense, each of which is subject to the death penalty, to have a full and fair assessment of whether the defendant intended their murder. And that's what Waddell says. But your argument is, if you miss and kill somebody else, transferred intent. Right. If you succeed in killing your intended victim, and you kill somebody else, no transferred intent. There's no transferred intent because you... Because you were a better shot. So that makes it sound awfully arbitrary. But it isn't arbitrary. It's a reasonable... It is how the law was described, and courts have since then expanded the law to include it, based on that sort of rationale. But when they've done so, at least in some cases, and I would cite Hinton and Fennell as two cases that are described in both briefs, the courts are acknowledging that, in fact, they're expanding the law when they do that, from where it was in 1984. In 1984, bad aim, for better or for worse, was how transferred intent was described. And what you asked me was, well, did the doctrine of transferred intent in those days preclude the multiple victim scenario? The answer is no, but nor did it include it. Certainly did not include it in terms of there being a majority of jurisdictions or the type of consensus that is necessary in order to give rise to that sort of generic definition. I just want to add one other thing with regard to transferred intent, which is... I would ask the court to take a look, and we cite them in our brief, the jury instructions. And I think Mr. Zausman acknowledged that the jury instructions on transferred intent were included at the penalty phase as well as at the guilt phase. And the case law is even clearer than in 1984, and even now, that transferred intent is not the sort of thing that should be looked at, that should be utilized in deciding on death worthiness. So... Is there any conclusion we can properly draw, Mr. Lusberg, from the fact that Mr. Purpura did make some objection at the close of the... after the jury instructions were given, and it didn't include an objection to transferred intent? As I said before, and this kind of goes to the record point, one of the big disputes between the parties here is the question of whether that objection would be required. The government cites Cruz and says it is. We cite the Supreme Court case Jones and a government version of violence versus I-can't-remember-who case that's in our brief that says... But the case law has said that if you object during the course of the charge conference, that Rule 30 is satisfied under Jones and the Third Circuit's decision, and the case that I'm not recalling the name of right now that's in our brief. So what we don't know is whether Mr. Purpura, it remains the case that we don't know whether Mr. Purpura objected during the course of the charge conference. And so, you know, if he did, that might explain why he wouldn't have objected at the conclusion of the proceedings. I see my time is up. Let me just say one last thing about transferred intent, and then I'll... Well, I want to say one thing about the records. But with regard to transferred intent, it could not be clearer from the jury instructions, and this is very important, that the findings with regard to one count influenced the penalty verdict on the other counts. That is, the jury was, the instructions in numerous ways, provided license to the jury to consider its verdict on one count in assessing what its verdict ought to be on other counts. So Mr. Zosmer is inaccurate when he stood at the podium and said the court was clear and counsel was clear in saying, here's the case with respect to this capital count. These are the aggravators with respect to this capital count. Pay attention to that. Oh, no. He's accurate when he says that. But the court also went on to say that the entire case should be considered in assessing death versus life with regard to each count. And so that part, so there's no question that the, and this is in our brief, I think it's page 191 of our initial brief. It's completely clear that the jury was entitled to, and the court instructed them that they could consider one count of death versus life. What happened in the case as a whole in deciding on the penalty for each count. So yes, they had to consider that count individually, but in doing so, they could consider the full, all the facts of the case as the court instructed. I don't think that Mr. Zosmer said anything to the contrary. I know he wouldn't because it isn't true. Finally, just with regard to the record, just two very quick points. I don't think there really is very much dispute, but that Judge Jordan, you're right, that things like emails, correspondence, and the like, can and should be part of the record under Rule 10. We've cited cases for that. Those cases are legion. I think when you look at them, you'll conclude that the argument that the types of materials we request are not covered is incorrect. I also just wanted to quickly provide the court with our citations to the lists that we provided. And those lists are at A2131, which is the material relating to undocketed written communications between counsel and the court, and A2359, which is material related to untranscribed proceedings. With regard to the former, and you can look through them yourself, you will see many situations in which these are absolutely not scheduling conferences, discussions of bathroom breaks, and the like. I would note that at A995.7 of the appendix, you'll find the government's, bless you, initial response to our motion in which the government took the position that that was all that was included in the appendix. And what was not made part of the record. And I think that when you look at our lists, you'll see that that is incorrect. Let me again thank the court for its time and patience today and obvious preparation. We really do appreciate it. Thank you. Thank you, Mr. Lesper. I want to thank, on behalf of the panel and on behalf of the entire Third Circuit, all of counsel. Hearing argument from Mr. Lesper and Mr. Zosmer, the panel was talking informally a short while ago, and we all agreed that in the two of you as advocates, and children of the Third Circuit, if you will, we just couldn't ask for better. And very much appreciate the advocacy that each of you demonstrated today. Also, the entire teams that have worked. The briefing in this case was superb. I would perhaps prefer that my holiday season next year was spent in some other way. And it's difficult to describe preparation in a capital case as being enjoyable or engaging. Because we recognize the somber nature of the matter before us. But it certainly makes our jobs much easier to have the truly stellar representation and advocacy that has been demonstrated. So we thank both of you. Thank all of you for your contributions in this case. We'll direct that a transcript of the oral argument be prepared. And the panel will now prepare to my chambers to contest the matter. Thank you very much. We ask the clerk to adjourn the proceedings.